UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

TONY MUHAMMAD,
PRESTON ADAMS,

        Plaintiffs,

        v.                                              Case No. 05-CV-0129

WISCONSIN COACH LINES, INC.,

        Defendant.

_____

**ORDER**

On April 29, 2005, plaintiffs Tony Muhammad ("Muhammad") and Preston Adams ("Adams") filed a second amended complaint against defendant, Wisconsin Coach Lines, Inc., ("Wisconsin Coach") alleging violations of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, et seq. In an order dated April 18, 2006, the court granted Wisconsin Coach's motion to dismiss the claims of Adams for lack of prosecution, and granted Muhammad's motion for an extension of time to respond to Wisconsin Coach's motion for summary judgment. On May 8, 2006, Muhammad filed an affidavit indicating that he would not file a response to the motion for summary judgment. For the reasons stated below, the court will grant Wisconsin Coach's motion for summary judgment.

**BACKGROUND**

The facts of the case are not in dispute. Wisconsin Coach provides transportation services throughout southeastern Wisconsin, between Milwaukee's

Mitchell International Airport and Chicago's airports, and across the United States through its charter service. Muhammad, an African-American, was employed by Wisconsin Coach from August 25, 2003, until he was terminated on May 21, 2004. Muhammad was hired as a motor coach driver by Wisconsin Coach's personnel manager, Evonne Powell ("Powell"). As the personnel manager, Powell was in charge of tracking, recording, communicating with, and disciplining Wisconsin Coach's employees regarding performance and attendance issues.

Wisconsin Coach provided Muhammad a position description and an employee handbook when he was hired. As indicated in the employee handbook, Wisconsin Coach has a 180-day orientation period for new employees. During this 180-day period, new employees are able to develop their skills and abilities while Wisconsin Coach is able to evaluate a new employee's skills, attitude, and working habits. Wisconsin Coach reserves the right to extend an employee's orientation period where it deems necessary. As indicated in the position description, the position of motor coach driver entails substantial physical requirements. (Powell Aff. Ex. 1.) Wisconsin Coach also stresses in its employee handbook that the company has "a very strict and severe Attendance and Tardiness Policy," which requires all drivers to report to work on a timely basis. (Powell Aff. Ex. 3.) On occasions when an emergency arises and a driver cannot report to work on time, the driver must call in at least 30 minutes prior to his or her scheduled start time. (*Id*.) This rule allows Wisconsin Coach to reassign drivers or otherwise provide coverage for its bus routes in order to ensure timely customer service. According to the employee handbook,

failure to comply with this policy will result in disciplinary action up to and including possible suspension or termination. (*Id.*)

Among Wisconsin Coach's work rules are a prohibition of "harassment" and "racial slur." (Powell Aff. ¶ 8.) Wisconsin Coach states to its employees that conduct that results in harassment will be investigated promptly and, where necessary, immediate appropriate action will be taken to stop and remedy such conduct. Additionally, according to the employee handbook, any Wisconsin Coach supervisor, agent, or employee found to be in violation of Wisconsin Coach's equal employment policy will be subject to disciplinary action up to and including termination. (Powell Aff. Ex. 3.) Wisconsin Coach's disciplinary action policy provides a list of offenses for which discipline or termination may be appropriate. (*Id.*) Wisconsin Coach sets out in the employee handbook various steps for a first offense, a second offense, and so on; however, Wisconsin Coach reserves the right to combine or skip steps depending on the severity of an infraction and the prior work history of the employee. (*Id.*) Powell was in charge of enforcing these policies as personnel director.

Muhammad earned his first of four attendance violations, referred to as a "no call – no show," on November 17, 2003, when he was 90 minutes late to work because he "overslept for the run . . . and was stuck in traffic." (Muhammad Dep. 15-16.) For this infraction, Powell issued a disciplinary notice warning to Muhammad which indicated that "any further issues will result in further disciplinary action up to and including possible suspension and/or termination." (Powell Aff. Ex. 4.)

Muhammad understood that future incidents could result in suspension or even termination and acknowledged that he was still an orientation employee at that point. (Muhammad Dep. 16.)

On December 5, 2003, Muhammad was again a "no call – no show." (Muhammad Dep. 16-17.) Powell issued Muhammad a second disciplinary notice on December 22, 2003. (Powell Aff. Ex. 5.) On December 23, 2003, Muhammad received a "Final Warning" as a result of a "no call – no show" on December 22, 2003. (Powell Aff. Ex. 6.) Muhammad reviewed and signed each of the above attendance warnings acknowledging that subsequent violations would jeopardize his employment with Wisconsin Coach.

On April 29, 2004, Muhammad was again a "no call – no show" for his assignment and Powell issued Muhammad a fourth disciplinary notice. (Powell Aff. Ex. 14.) Muhammad, however, refused to sign the notice stating that he checked the schedule and did not see his name on it. The incident report prepared by the dispatcher regarding Muhammad's absence noted that the assignment had been posted since April 26, 2004, and that Muhammad had worked on April 27 and April 28. (Powell Aff. Ex. 13.) Muhammad claimed that he had an agreement with a dispatcher to make up for the morning run he missed by voluntarily taking the afternoon run. (Muhammad Dep. 17.) In light of Muhammad's attendance issues, Wisconsin Coach extended Muhammad's orientation period for an additional 90 days. The extension did not affect Muhammad's pay.

-4-
Case 2:05-cv-00129-JPS   Filed 10/16/06   Page 4 of 16   Document 50

In addition to Muhammad's attendance issues, Wisconsin Coach received four customer complaints regarding Muhammad. According to a complaint received on January 9, 2004, Muhammad was sitting in his bus at Midway International Airport when a customer knocked on the door of the bus to question where the bus was going. (Powell Aff. Ex. 9.) Muhammad, however, ignored the customer and drove away. (*Id*.) The customer intended to take Muhammad's bus but, because he ignored her, she was forced to wait and take a competitor's bus to O'Hare International Airport. (*Id*.)

Wisconsin Coach received a second customer complaint regarding an incident that occurred at O'Hare International Airport on February 29, 2004. According to the complaint, Muhammad pulled up to the wrong door at O'Hare, waited a couple minutes without exiting the bus or loading any passengers, and drove off. (Powell Aff. Ex. 10.) Because the 10:10 p.m. pick up at O'Hare International is the last Wisconsin Coach run of the day, at least 6 customers were left stranded at O'Hare. (*Id.*) As a result of the incident and the resultant customer complaints, Wisconsin Coach refunded the passengers' full fare and provided them complementary bus tickets for a future trip. (*Id.*) Powell spoke with Muhammad regarding the incident. Muhammad told Powell that if he was at the wrong door, he still would have seen people waiting to get on the bus and that he normally goes inside to see whether someone is planning on taking his bus. (*Id*.)

Wisconsin Coach received a third customer complaint regarding an incident that took place on April 24, 2004. (Powell Aff. Ex. 11.) According to the complaint,

a customer was waiting at the bus stop for the Wisconsin Coach bus pick up scheduled for 2:25 p.m.; however, the customer saw the Wisconsin Coach bus travel past the stop without stopping to pick up passengers. (*Id.*) The customer called into Wisconsin Coach's dispatcher to find out if the Wisconsin Coach bus that had passed was the customer's bus. (*Id.*) When the dispatcher contacted Muhammad, he said that he had stopped at the bus stop and there were no passengers. (*Id.*) Powell spoke with Muhammad on April 30, 2004, regarding the incident and Muhammad again claimed that he made the stop but there were no passengers to pick up. (*Id.*)

Wisconsin Coach received a fourth complaint against Muhammad regarding an unsafe lane change. (Powell Aff. Ex. 12.) As a result, Muhammad was counseled regarding safe lane changes and using his directional signals in advance of a lane change to make his intentions clear to other drivers.

Another incident occurred on February 19, 2004, when Muhammad had a work-related disagreement with a Wisconsin Coach dispatcher. After Muhammad arrived late for work, the dispatcher asked Muhammad to perform several tasks, including removing items from a bus. (Powell Aff. Ex. 18.) Instead of performing the tasks, Muhammad became upset that the dispatcher had made this request and questioned why the tasks were not performed by Wisconsin Coach's mechanics or cleaners the previous night. (*Id.*) Eventually the dispatcher agreed to clean the bus and asked Muhammad to start the bus, however, when the dispatcher went out to the particular bus, it was not started. (*Id.*) Powell spoke with Muhammad that day

regarding this incident and both Muhammad and the dispatcher prepared incident reports. (Powell Aff. Exs. 19-20.)

During the course of Muhammad's employment, he filed a number of harassment complaints which were investigated by Powell. In December 2003, Muhammad made Powell aware of an incident he learned about from other Wisconsin Coach drivers involving a Caucasian Wisconsin Coach driver. Muhammad heard from the other drivers that the Caucasian driver had made racial comments over the radio. Muhammad referred Powell to another driver who had a concern regarding the comments. Powell interviewed several drivers who worked on the night in question and none of them claimed to have heard a racial comment. Powell determined that because drivers were playing Christmas music over the radio, the Caucasian driver said "stop monkeying around!" (Powell Aff. ¶ 22.) She counseled the driver to watch what he said over the radio and told him to use appropriate language. (*Id*.)

On February 4, 2004, Muhammad filed a written complaint regarding racial disparity. (Powell Aff. Ex. 15.) Powell asked Muhammad to prepare a more detailed incident report regarding his allegations so that she could perform a thorough investigation. Muhammad submitted a more detailed report on or about February 12, 2004, and Powell began her investigation of his allegations. (Powell Aff. Ex. 16.) After completing her investigation, Powell met with Muhammad on March 12, 2004, and informed Muhammad that she had spoken with a driver regarding a comment that allegedly occurred on September 18, 2003. (Powell Aff.

Ex. 17.) Powell indicated that she had counseled the driver regarding the comment, apologized to Muhammad for the comment, and told Muhammad that she had determined the comment was not racial in nature. (*Id.*) Powell indicated that she would speak to the other drivers regarding the comments that Muhammad had brought to her attention and told Muhammad that if he ever felt that he was being subject to racial discrimination, he should report it to her. (*Id.*)

On May 14, 2004, Muhammad filed a formal discrimination charge with the Equal Employment Opportunity Commission ("EEOC") against Wisconsin Coach. On May 17, 2004, Powell met with Mike Pjevach ("Pjevach"), Wisconsin Coach's president, and Tom Dieckelman ("Dieckelman"), Wisconsin Coach's vice president, to discuss Muhammad's job performance. At the time of the meeting, Powell, Pjevach, and Dieckelman were unaware of Muhammad's EEOC charge against Wisconsin Coach. (Powell Aff. Ex. 28.) Powell told Pjevach and Dieckelman that Muhammad's performance had not improved since his orientation period was extended in February 2004 and that, as a result, his employment with Wisconsin Coach was to be terminated. (*Id.*) After the meeting adjourned and the decision was made to terminate Muhammad, Powell collected the day's mail from her mailbox outside Pjevach's office, returned to her office, and found Muhammad's EEOC charge in her unopened mail. (*Id.*) Muhammad was terminated on May 21, 2004. (Powell Aff. Ex. 29.) On November 24, 2004, the EEOC issued Muhammad a right to sue letter and Muhammad filed his initial complaint in this action on February 3, 2005.

**ANALYSIS**

Summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable and justifiable inferences in favor of that party. *See id.* at 255. Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

As a preliminary matter, it should be noted that Wisconsin Coach's motion for summary judgment complied with Civil Local Rule 56.1 (E.D. Wis.) by including a short and plain statement that any factual assertion in Wisconsin Coach's motion for summary judgment would be accepted by the court as true unless Muhammad submitted his own affidavits or other admissible documentary evidence contradicting Wisconsin Coach's factual assertions, and by including the text of Federal Rules of

Civil Procedure 56(e) and (f), and Civil Local Rules 7.1, 56.1, and 56.2. Despite this notice, Muhammad did not submit affidavits or other documentary evidence of his own to contradict Wisconsin Coach's factual assertions.

Muhammad's second amended complaint raises three claims against Wisconsin Coach. His first claim is a claim of racial harassment, discrimination, and retaliation under Title VII and 42 U.S.C. § 1981. His second claim is a disparate impact claim under Title VII and the ADA. Finally, his third claim reiterates his prior claims, asserting that Wisconsin Coach acted with malice and reckless indifference, however, Muhammad offers no specific support for this last claim. The court will analyze Muhammad's claims in the following order: (1) racial harassment; (2) discrimination and retaliation based on race; and (3) disparate impact.

First, in order to establish a prima facie claim for racial harassment under Title VII and 42 U.S.C. § 1981, Muhammad must establish that: (1) he was subject to unwelcome harassment; (2) the harassment was because of his race; (3) the harassment was so severe or pervasive as to alter the conditions of his work environment by creating a hostile or abusive situation; and (4) that there is some basis for employer liability. *See Williams v. Waste Management of Illinois, Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004).

In order to show that harassment created a hostile environment, Muhammad must show that the harassment was, among other things, both subjectively and objectively hostile, i.e., that the plaintiff subjectively found it hostile and a reasonable person would also find it to be hostile. *See Hostetler v. Quality Dining, Inc.*, 218 F.3d

798, 807 (7th Cir. 2000); *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 271 (7th Cir. 2004). Under the objective hostility analysis, courts may consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) whether it unreasonably interferes with the employee's ability to complete his or her assigned duties. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Because Muhammad does not allege harassment by supervisory personnel, Muhammad must show that Wisconsin Coach was negligent in responding to the alleged harassment by Muhammad's co-workers. *Williams*, 361 F.3d at 1029. An employer is not liable for its co-worker harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000).

Here, given that Muhammad did not respond to Wisconsin Coach's motion for summary judgment or submit any documentary evidence, Muhammad has not alleged any specific incidents which the court could construe as racial harassment. Additionally, the record demonstrates that Wisconsin Coach investigated each complaint filed by Muhammad and counseled employees as necessary. (Powell Aff. ¶¶ 22, 26, 27.) Thus, considering all the facts in the light most favorable to Muhammad, he has not alleged any facts that would lead the court to conclude that Wisconsin Coach created a work environment that a reasonable person would find hostile or abusive. Accordingly, Muhammad's claim of racial harassment under

Title VII and 42 U.S.C. § 1981 lacks sufficient support in the record to survive Wisconsin Coach's motion for summary judgment.

Second, Muhammad asserts that Wisconsin Coach discriminated against him in violation of Title VII and 42 U.S.C. § 1981, and retaliated against him for filing complaints by giving him undesirable work assignments, tolerating a work environment in which African-American employees are spoken to in a rude and demeaning manner, extending his orientation period, subjecting him to unwarranted discipline, denying him the opportunity to participate in the employer's group health insurance plan even though he consistently worked more than 30 hours per week, and ultimately terminating him. (Am. Compl. ¶ 18.)

Because Muhammad presented no direct evidence of intentional discrimination or retaliation, Muhammad's race discrimination and retaliation claims will be analyzed under the *McDonnell Douglas* burden shifting approach. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In order to survive summary judgment under the burden shifting method, Muhammad must first establish a prima facie claim by showing that: (1) he belongs to a protected class; (2) his performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly-situated others not in the protected class received more favorable treatment. *See Williams*, 361 F.3d at 1034. If Muhammad establishes a prima facie claim, the burden shifts to Wisconsin Coach who may then articulate a legitimate business reason that justified the action it took. *See McDonnell Douglas*, 411 U.S. at 802-03. Once such a reason is presented, the plaintiff must establish

by a preponderance of the evidence that the employer's stated reason is merely a pretext for discrimination or retaliation. *See Walker v. Glickman*, 241 F.3d 884, 889 (7th Cir. 2001).

It is undisputed that Muhammad, as an African-American, is a member of a protected class. While Muhammad's termination certainly qualifies as an adverse employment action, *see Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003), Muhammad has not demonstrated that he was meeting Wisconsin Coach's legitimate expectations. To the contrary, the record demonstrates that the reason Muhammad was terminated by Wisconsin Coach was because he was not meeting his employer's legitimate expectations. Specifically, Wisconsin Coach reasonably expects its drivers to be on time for work and to perform their jobs professionally. Muhammad, however, accumulated four attendance violations and four customer complaints during his orientation period.

Furthermore, Muhammad has not demonstrated that similarly-situated non-protected employees were treated more favorably than he was. Indeed, during the time period that Muhammad was employed by Wisconsin Coach, Wisconsin Coach's African-American drivers were assigned hours similar to Caucasian drivers. (Powell Aff. ¶ 3.) Additionally, Wisconsin Coach extended the orientation period for a Caucasian driver as well as for Muhammad. (Powell Aff. Ex. 8.) Finally, even if Muhammad had established a prima facie claim of discrimination or retaliation, Wisconsin Coach articulated legitimate business reasons for the actions it took in

each instance and produced evidence in support of these reasons. Accordingly, the court concludes that Muhammad's discrimination and retaliation claims lack merit.

Third, Muhammad's complaint alleges that Wisconsin Coach's method of determining how an employee was eligible for Wisconsin Coach's health insurance plan had a disparate impact upon African-American employees and employees protected by the ADA. (Compl. ¶¶ 29-30.) To survive summary judgment under a disparate impact theory, Muhammad must show that the employment practice at issue, Wisconsin Coach's health insurance eligibility criteria, falls more harshly on African-Americans and those with disabilities than other employees. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993). Muhammad must also show that the policy cannot be justified by business necessity. *Id.*

Here, Muhammad has offered no evidence in support of his disparate impact claim. Contrary to his claim, the record suggests that Wisconsin Coach's policy in regard to eligibility for health insurance is based on length of service, is neutral as to any given employee's race or disability status, and does not treat one group of employees more harshly than another. Specifically, part-time drivers employed by Wisconsin Coach are not eligible for health insurance; however, after completing their orientation period and working for Wisconsin Coach for a period of 1 year, that driver becomes eligible for health insurance benefits if the employee is promoted to a full-time driver position and works in that position for a period of 60 days. (Powell Aff. Ex. 3.) Additionally, Wisconsin Coach states that even if the company is aware

of an employee's disability, that knowledge plays no role in how the policy is applied. (Powell Aff. ¶ 39.)

As noted above, Muhammad worked for Wisconsin Coach from August 25, 2003, until May 21, 2004, less than a full year. Muhammad did not allege in his deposition that he was denied health insurance because of his race or as a result of his alleged disability.[1] (Muhammad Dep. 26-29.) Assuming Muhammad had offered evidence to support his disparate impact claim, Wisconsin Coach offered evidence demonstrating that African-Americans at Wisconsin Coach became eligible for and participated in Wisconsin Coach's health insurance plan. For example, in 2003 and 2004, eight African-American drivers were eligible or became eligible by virtue of their elevation to full-time status for Wisconsin Coach's health insurance. (Powell Aff. ¶ 38.) Furthermore, Wisconsin Coach offered legitimate business reasons for its policy, indicating that it uses length of service as a qualification for the health insurance plan as an incentive to encourage workers to stay at the company. Thus, the evidence demonstrates that there is no basis in fact for Muhammad's claim that Wisconsin Coach's health insurance eligibility qualifications have a disparate impact against African-Americans or employees with disabilities.

Muhammad's claims of harassment, discrimination, retaliation, and disparate impact all fail at the prima facie level. Muhammad has not established that the incidents he reported to Wisconsin Coach amounted to either severe or pervasive

---

[1] Muhammad's claimed disability is "occasional stiffness and just reoccurrence of this. It's like I would just say a soreness . . . like a knot." (Muhammad Dep. 25.)

harassment or that they created a hostile work environment. Further, he has not shown that Wisconsin Coach intentionally discriminated against him based on his race or alleged disability, or that his race or alleged disability prompted any difference in treatment. Muhammad also has not demonstrated that Wisconsin Coach was negligent in investigating his allegations of harassment and discrimination attributed to his co-workers. Nor has he offered support for his claim that Wisconsin Coach acted with malice and reckless indifference. Finally, Wisconsin Coach demonstrated a legitimate, non-invidious reason for terminating Muhammad: Muhammad's performance had not improved since his orientation period was extended. In light of the foregoing, the court concludes that Wisconsin Coach has established that there is no genuine issue as to any material fact and is entitled to judgment as a matter of law.

Accordingly,

**IT IS ORDERED** that the defendant's motion for summary judgment (Docket # 43) be and the same is hereby **GRANTED** and this action be and the same is hereby **DISMISSED** with prejudice, together with costs as taxed by the clerk of the court.

The clerk of the court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 16th day of October, 2006.

BY THE COURT:

s/ J. P. Stadtmueller
J. P. Stadtmueller
U.S. District Court